**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**LORETTA GRIMES,**

Plaintiff,

v.

**LFRC ST. LOUIS, LLC,**
**d/b/a LEE'S FAMOUS RECIPE CHICKEN,**

Defendant.

Case No. 4:26-cv-02034

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Loretta Grimes ("Plaintiff" or "Ms. Grimes"), by and through her undersigned counsel, states as follows for her Complaint against Defendant LFRC St. Louis, LLC, d/b/a Lee's Famous Recipe Chicken ("Defendant" or "LFRC"):

## NATURE OF THE ACTION

1. This is an action for race and color discrimination, sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); race discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and failure to issue a service letter in violation of section 290.140, RSMo.

2. Ms. Grimes, a mixed-race woman, was a Shift Manager at Defendant's Lee's Famous Recipe Chicken restaurant in St. Peters, Missouri, and was recognized as Shift Manager of the Year in 2025. On June 22, 2025, a Caucasian male cashier whom she was supervising called her a "bitch" in front of customers and staff and challenged her to "take this outside." Ms. Grimes reported his conduct to her managers and then, when local management did not act, to Defendant's corporate office. Defendant's corporate representative, Bill Sparks, directed in writing that the cashier be terminated "ASAP for insubordination."

3. Days later, Ms. Grimes reported to Mr. Sparks and to Defendant's upper management what she believed in good faith to be sexual harassment of a male co-worker by a female manager, Shannon Masterson, and renewed her request that Defendant provide sexual harassment training to its employees and managers. Defendant's posture then reversed. Mr. Sparks accused Ms. Grimes of "fabricating stories," told her that "it's OK to leave," and criticized her for "going over [her managers'] head and coming to me." Five days later, Defendant terminated Ms. Grimes by a notice signed by Ms. Masterson, the very manager whose conduct Ms. Grimes had reported, that cited as a reason for termination her "going to Bill Sparks." The same day, Defendant fired the African-American co-worker who had written to Mr. Sparks in support of Ms. Grimes. Defendant did not terminate the Caucasian cashier.

## PARTIES

4. Plaintiff Loretta Grimes is an individual who resides in St. Peters, St. Charles County, Missouri.

5. Ms. Grimes is a woman. She is of mixed race, partially of African-American descent, and is not Caucasian.

6. Defendant LFRC St. Louis, LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1270 N. Eglin Parkway, Suite C14, Shalimar, Florida 32579.

7. Defendant does business in Missouri under the name "Lee's Famous Recipe Chicken" and, at all relevant times, owned and operated the Lee's Famous Recipe Chicken restaurant located at 690 Starwood Drive, St. Peters, Missouri 63376, designated by Defendant as Store 205770 and Unit #5770 (the "Restaurant").

8. Upon information and belief, on or about May 20, 2024, Defendant acquired fifteen Lee's Famous Recipe Chicken restaurants in the St. Louis metropolitan area, including the Restaurant, from EJC Enterprises, Inc., and thereafter employed Ms. Grimes until July 22, 2025.

9. At all relevant times, Defendant was an "employer" within the meaning of 42 U.S.C. § 2000e(b), in that it was engaged in an industry affecting commerce and employed fifteen or more employees for each working day in each of twenty or more calendar weeks in the then-current or preceding calendar year.

10. At all relevant times, Defendant acted through its officers, managers, supervisors, and agents, including Bill Sparks, Jacob Gamache, Hilary Gamache, Shannon Masterson, Noah Brown, and a manager known to Ms. Grimes as Cindy, whose surname is not presently known to Plaintiff, each of whom acted within the course and scope of his or her employment or agency with Defendant.

## JURISDICTION AND VENUE

11. This Court has original subject-matter jurisdiction over Plaintiff's Title VII and Section 1981 claims under 28 U.S.C. §§ 1331 and 1343(a)(4), because those claims arise under the laws of the United States and seek relief under Acts of Congress providing for the protection of civil rights.

12. This Court has supplemental jurisdiction over Plaintiff's claim under section 290.140, RSMo, pursuant to 28 U.S.C. § 1367(a), because that claim arises from Plaintiff's employment with and discharge by Defendant and is so related to Plaintiff's federal claims that it forms part of the same case or controversy under Article III of the United States Constitution.

13. This Court has personal jurisdiction over Defendant because Defendant transacts business in Missouri, owned and operated the Restaurant in St. Charles County, Missouri, and committed the acts giving rise to this action in Missouri.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices alleged herein were committed in St. Charles County, Missouri, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

15. Venue is proper in the Eastern Division of this District under 28 U.S.C. § 105(a)(1) and E.D. Mo. L.R. 2.07, because Plaintiff's claims arose in St. Charles County, Missouri.

## ADMINISTRATIVE PREREQUISITES

16. On or about January 27, 2026, Ms. Grimes signed under penalty of perjury and filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which the EEOC docketed as Charge No. 560-2026-01383 (the "Charge"). The Charge identified the respondent as "Lee's Famous Recipe Chicken Unit #5770," 690 Starwood Drive, Saint Peters, Missouri 63376, the trade name and store designation under which Defendant operated the Restaurant. The Charge requested that it be filed with both the EEOC and the Missouri Commission on Human Rights.

17. The Charge identified race, color, retaliation, and hostile work environment as bases of discrimination; described the June 22, 2025 incident, Ms. Grimes's reports to Defendant, and her termination; and stated that Ms. Grimes was "discriminated against based on my race and gender" and "terminated in retaliation for exercising my protected rights to report workplace discrimination and harassment."

18. The Charge was filed within 300 days after Defendant terminated Ms. Grimes's employment on July 22, 2025, as required by 42 U.S.C. § 2000e-5(e)(1).

19. Defendant received notice of the Charge and participated in the EEOC's processing of it through counsel. On or about August 14, 2026, Defendant, identifying itself as "LFRC St. Louis, LLC d/b/a Lee's Famous Recipe Chicken," submitted a written position statement to the EEOC in which it denied that it had discriminated against Ms. Grimes "because of race, color, or sex," subjected her to a hostile work environment, or retaliated against her for protected activity.

20. On September 1, 2026, the EEOC issued a Determination and Notice of Rights on the Charge, notifying Ms. Grimes of her right to sue Defendant within 90 days of her receipt of the notice. Ms. Grimes and her counsel received the notice by electronic transmission on September 1,

2026. A true and accurate copy of the Determination and Notice of Rights is attached as *Exhibit 1* and incorporated by reference.

21. Ms. Grimes has filed this action within 90 days after her receipt of the Determination and Notice of Rights, as required by 42 U.S.C. § 2000e-5(f)(1).

22. All conditions precedent to Ms. Grimes's Title VII claims have been performed, have occurred, or have been excused.

23. Ms. Grimes's claim under Section 1981 is not subject to any administrative exhaustion requirement and is timely under 28 U.S.C. § 1658(a).

## FACTUAL ALLEGATIONS

### A. Ms. Grimes's Employment and Performance

24. Ms. Grimes began working at the Restaurant in or about August 2022.

25. In or about July 2023, Ms. Grimes was promoted to the position of Shift Manager at the Restaurant. She continued to serve as a Shift Manager after Defendant acquired the Restaurant in or about May 2024, and she held that position until Defendant terminated her employment on July 22, 2025.

26. As a Shift Manager, Ms. Grimes directed the work of hourly team members during her shifts, enforced Defendant's operating and cash-handling procedures, and was responsible for reporting workplace misconduct to her superiors. Ms. Grimes had authority to send team members home during a shift, but she did not have authority to terminate a team member's employment.

27. Upon information and belief, during the relevant period Ms. Grimes reported to Cindy, who reported to Restaurant manager Noah Brown, who reported to Area Supervisor Shannon Masterson, who reported to Defendant's Director of Operations, Jacob Gamache.

28. Bill Sparks held a corporate-level position with Defendant above the Restaurant's management and its Director of Operations.

29. Ms. Grimes performed her duties competently and in good faith. In 2025, she was recognized as Shift Manager of the Year.

30. In its position statement to the EEOC, Defendant acknowledged that, until mid-2025, Ms. Grimes's "employment history with Respondent was considered ordinary without major incidents."

31. Ms. Grimes's final rate of pay was $16.50 per hour. Until June 2025, she regularly worked approximately 30 hours per week.

32. In or about June 2025, Ms. Grimes asked her managers for a raise of $0.50 per hour or, in the alternative, a move from the closing shift to the pre-close shift, because closing shifts ended late at night and interfered with her ability to report early to a second job. Defendant denied the raise, moved Ms. Grimes to the pre-close shift, and reduced her scheduled hours from approximately 30 hours per week to approximately 12 to 20 hours per week. Ms. Grimes objected in writing to the reduction in her hours.

**B. The June 22, 2025 Incident**

33. On the evening of Sunday, June 22, 2025, Ms. Grimes was a Shift Manager on duty at the Restaurant.

34. Defendant's procedures required that a manager verify large-denomination bills received from customers before they were accepted.

35. At approximately 7:00 p.m., Ms. Grimes observed a cashier working the drive-through, a Caucasian male named Jacob whose surname is presently unknown to Plaintiff (the "Cashier"), accept a large-denomination bill from a customer without first having a manager verify it.

36. Ms. Grimes reminded the Cashier that large bills had to be checked by a manager before acceptance. The Cashier mumbled a response and referred to Ms. Grimes as "Lo Lo." Ms. Grimes told him to address her by her name.

37. The Cashier then called Ms. Grimes a "bitch," a sex-specific slur, in front of customers and other team members.

38. When Ms. Grimes addressed the Cashier's language, the Cashier escalated further and asked whether she wanted to "take this outside." The suggestion to go outside was the Cashier's, not Ms. Grimes's, and Ms. Grimes had no intention of fighting him. Ms. Grimes responded, "Let's go," to get the Cashier to move away from the drive-through window and the customers and out of the Restaurant, for the safety of customers and staff. Ms. Grimes did not follow the Cashier outside, and there was no physical contact between them. Another Shift Manager on duty intervened and told both of them to stop, and the Cashier left the building.

39. A customer who had observed the exchange approached Ms. Grimes, stated that the Cashier's behavior was inappropriate, and stated that he intended to report the Cashier's conduct to Defendant's corporate office.

40. Beginning at approximately 7:26 p.m. that evening, Ms. Grimes reported the incident by group text message to her managers, including Cindy, Mr. Brown, and Ms. Masterson. She reported that the Cashier had called her a "bitch" in front of customers and staff, that he had asked if she wanted to "take this outside," that another Shift Manager had witnessed the exchange, and that if there was no discipline she would file a complaint with Defendant's corporate office.

41. At approximately 8:08 p.m., Cindy responded to the group that statements were needed "from everyone involved in this situation" and that management would "go from there after we receive all statements and talk with everyone," and she asked whether the Cashier's shift was covered for the night.

42. Upon information and belief, Jacob Gamache was also made aware of the incident on or shortly after June 22, 2025.

43. Upon information and belief, Restaurant management did not thereafter request statements from the team members who witnessed the incident, did not request a statement from Micah Pippens, a manager who was working in the kitchen that night, and did not follow up with Ms. Grimes.

44. Ms. Grimes then obtained signed written statements from two team members who witnessed the incident, after each confirmed to her that no manager had asked for a statement. One

of those witnesses stated in writing that the Cashier told Ms. Grimes to come outside, said that he was going to fight her, and then ran out the back door calling for her to come out.

45. Ms. Grimes informed local management that she had obtained witness statements. No disciplinary action was taken against the Cashier.

46. Ms. Grimes also called Defendant's corporate office by telephone to report the incident and was told to keep the matter local.

47. On or about July 1, 2025, the Cashier, who remained employed, made rude comments to Ms. Grimes at the Restaurant when she clocked in.

### C. Ms. Grimes Escalates Her Complaint, and Defendant's Corporate Office Directs That the Cashier Be Terminated

48. On July 1, 2025, after local management had failed to act on her complaint for more than a week, Ms. Grimes emailed Mr. Sparks. She wrote that an incident she had reported "has not been addressed through the usual channels," that she had reported it to her managers without follow-up or resolution, and that she had attempted to contact Defendant's corporate office without meaningful assistance. She attached her own written statement of the incident and the two witness statements.

49. Ms. Grimes's written statement attached to her July 1, 2025 email disclosed that, when the Cashier asked whether she wanted to "take this outside," she had responded, "Let's go."

50. Mr. Sparks responded the same day, copying Jacob Gamache and Hilary Gamache, that he did not see where Jacob Gamache had been made aware of the situation and that he was out of the country until July 17, 2025. Ms. Grimes replied that Jacob Gamache, Mr. Brown, Cindy, and Ms. Masterson had each been notified of the incident on June 22, 2025.

51. Later on July 1, 2025, with Ms. Grimes's statement and the two witness statements in hand, Mr. Sparks wrote to Ms. Grimes, again copying Jacob Gamache and Hilary Gamache:

> B) Unless Jacob objects, have all team members who worked that night and witnessed Jake's insubordination, to fill out a statement stating what they saw in detail. They need to sign and date their statements.
>
> C) Place all statements including your statement in a file and give to Jake.
>
> D) After the TM statements are signed and dated, terminate Jake ASAP for insubordination.

52. In that email, Mr. Sparks used the names "Jacob" and "Jake" to refer both to Jacob Gamache and to the Cashier. The instruction to "terminate Jake ASAP for insubordination" referred to the Cashier.

53. On July 2, 2025, Mr. Sparks wrote again, copying Jacob Gamache, Hilary Gamache, Ms. Masterson, and Mr. Brown: "Just following up to ask if Jake the cashier was terminated yesterday or other steps were taken."

54. In its position statement to the EEOC, Defendant acknowledged that, based on the information initially presented, its management believed the Cashier should be terminated.

55. Defendant did not terminate the Cashier. Upon information and belief, Defendant did not suspend the Cashier.

56. Before June 22, 2025, Defendant suspended Micah Pippens, an African-American employee at the Restaurant, for one week for using profanity toward Ms. Masterson.

57. The Cashier, a Caucasian employee, called his female supervisor a "bitch" and challenged her to "take this outside" in front of customers, and Defendant neither terminated nor, upon information and belief, suspended him.

**D. Ms. Grimes Reports Suspected Sexual Harassment and Requests Sexual Harassment Training**

58. On July 2, 2025, Mr. Pippens came to Ms. Grimes, in her capacity as a manager, with a concern about Ms. Masterson. Mr. Pippens told Ms. Grimes that Ms. Masterson had asked him about money that was missing, that he had told her he did not know where it was, and that Ms. Masterson later returned with his paycheck while his hands were covered in batter and attempted to

place the check into different pockets of the pants he was wearing. Mr. Pippens told Ms. Grimes that he believed Ms. Masterson may have been checking his pockets for the missing money.

59. Ms. Grimes was not present at the Restaurant when the events Mr. Pippens described occurred, and she never claimed to have witnessed them.

60. Before July 4, 2025, Ms. Grimes had asked her manager that all employees and managers be required to complete sexual harassment training. Defendant had not acted on that request.

61. On July 4, 2025, Ms. Grimes emailed Mr. Sparks, copying Jacob Gamache, Hilary Gamache, Ms. Masterson, and Mr. Brown. She informed Mr. Sparks that, to her knowledge, the Cashier was still employed, and she reported the July 2 incident as follows:

> If a male manager were to walk up behind a female employee and start going into her front pockets without permission, it would be considered sexual harassment. This exact behavior occurred on July 2nd, except it was a female doing this to a male employee, and it was captured on camera.

62. In the same email, Ms. Grimes wrote that she had "previously brought up to my manager that every employee, whether management or not, should be required to complete sexual harassment training," that "[t]o date, this still hasn't been addressed," and that she "believe[d] this is a serious issue that warrants immediate attention." She asked what steps would be taken "to ensure a respectful and professional work environment for everyone."

63. Ms. Grimes made her July 4, 2025 report in good faith, based on information reported to her by the affected employee, and in furtherance of her responsibility as a manager to report potential harassment. She reasonably believed that a supervisor's placing her hands into the front pants pockets of a subordinate of the opposite sex without his permission could constitute sexual harassment prohibited by Title VII.

64. Defendant understood Ms. Grimes's July 4, 2025 report to concern Ms. Masterson's conduct toward Mr. Pippens.

65. On July 17, 2025, having received no response, Ms. Grimes emailed Mr. Sparks again. She wrote that management had not reached out to any of the staff who worked on June 22 to obtain their statements, that to her knowledge the Cashier was still employed, and that the July 2 incident required attention. She asked for an update on “[n]ext steps regarding Jacob and the June 22nd incident,” on “[h]ow the July 2nd incident is being addressed,” and on “[w]hether there are plans to implement mandatory sexual harassment training for all employees and management.”

**E. Defendant Reverses Course and Turns on Ms. Grimes**

66. On July 17, 2025, less than ninety minutes after Ms. Grimes’s follow-up email, Mr. Sparks responded, copying Ms. Masterson, Jacob Gamache, and Hilary Gamache. He stated that the day before he had “reached out to both Jake and Shannon regarding the incidents,” referring to Jacob Gamache and to Ms. Masterson, the manager who was the subject of Ms. Grimes’s July 4 report.

67. Mr. Sparks wrote: “Regarding cashier Jake, you failed to mention your part of this situation. That is you continued to provoke Jake until he became upset. You then told him you could take the matter outside. This is conduct unbecoming of a Lee’s Famous Recipe manager/leader.” He asserted that Jacob Gamache and Ms. Masterson “have signed statements from other team members who were working that day.”

68. Mr. Sparks’s assertion that Ms. Grimes had “failed to mention” her part in the exchange was false. Her written statement, which Mr. Sparks had received on July 1, 2025, and on the basis of which he had directed that the Cashier be terminated “ASAP for insubordination,” disclosed her response to the Cashier’s challenge.

69. As to Ms. Grimes’s July 4 report, Mr. Sparks wrote that “[t]here was no sexual harassment involved.”

70. Mr. Sparks then wrote:

> Loretta, I think you need to decide whether if you want to continue working for Lee's Famous Recipe. You don't seem to be happy or satisfied in your position. This is obvious because of the continuous trouble in which you're trying to cause and your unprofessional conduct. Also, I am not sure why you didn't go straight to Shannon or Jake versus going over their head and coming to me. If you are not happy, then it's OK to leave. However, if you want to stay employed with us, then we would ask that you, as a member of the management team, please perform your duties to the fullest and discontinue causing trouble by fabricating stories.

71. The "trouble" and "stories" to which Mr. Sparks referred were Ms. Grimes's complaints about the Cashier's sex-based slur and threat, her report of suspected sexual harassment by Ms. Masterson, and her requests for sexual harassment training.

72. Ms. Grimes had in fact gone "straight to Shannon," among others, on the night of June 22, 2025, and contacted Mr. Sparks only after local management failed to act.

73. Upon information and belief, Defendant's written policies permit an employee to raise concerns with upper management when the employee believes local management has not adequately addressed a concern. In its position statement to the EEOC, Defendant represented that its policies "provide multiple reporting channels, and permit an employee to raise concerns with local management or upper management when the employee believes a concern has not been adequately addressed."

74. On July 18, 2025, Ms. Grimes responded in writing to Mr. Sparks, copying Jacob Gamache, Hilary Gamache, and Ms. Masterson. She disputed that she had provoked the Cashier; explained that she had submitted her own signed statement and two signed witness statements on July 1; stated that she had not been provided or shown the other statements Mr. Sparks referenced; and stated that the two witnesses, and additional staff who worked in the back, had told her that local management never approached them about that night. She attached her written statement and the two witness statements to that email.

75. As to her July 4 report, Ms. Grimes wrote: "I never claimed to have personally witnessed the alleged inappropriate conduct. My report was based on concerns raised by staff and

submitted because it appeared to warrant management attention. Reporting such concerns is part of my responsibility under company standards—not an attempt to fabricate information."

76. Mr. Sparks replied that afternoon, copying the same managers: "I followed up with Jake and Shannon. They will be reaching out to you soon."

**F. Mr. Pippens Supports Ms. Grimes, and Defendant Fires Them Both**

77. On July 19, 2025, Mr. Pippens sent Mr. Sparks a letter by email in support of Ms. Grimes. Mr. Pippens wrote that he was working in the kitchen on the night of June 22, that he "heard the raising of one voice that was that night and that was Jake," referring to the Cashier; that Ms. Grimes "has no reason to fabricate, make up, or tell a lie about the situation"; and that Jacob Gamache and Ms. Masterson ("Jake and Shannon") "seemed to get every statement that night except my own." Mr. Pippens added that Ms. Masterson "had no business reaching in my pockets to put my check in it to begin with."

78. Mr. Sparks received Mr. Pippens's letter and responded to Mr. Pippens on July 20, 2025, copying Jacob Gamache and Ms. Masterson.

79. On July 22, 2025, two days later, and five days after Mr. Sparks's July 17 email, Defendant terminated the employment of both Ms. Grimes and Mr. Pippens.

80. When Ms. Grimes arrived at the Restaurant for work on July 22, 2025, she was met at the door, seated, and handed a written termination notice.

81. The termination notice, headed "PSF Employee termination" and "STORE 205770," stated in its entirety as the explanation for Ms. Grimes's termination:

> Failure to follow company policies and procedures causing loss of employees and sales and creating an overall negative work environment. Breaking the chain of command by going to Bill Sparks and skipping over upper management in 205770 and D.O. Jacob Gamache. LFRC has decided to end the At-Will employment of Loretta Grimes, effective 7/22/2005 [sic].

82. The termination notice was signed by Shannon Masterson as "Area Supervisor," the manager whose conduct Ms. Grimes had reported on July 4, 2025, and by Hilary Gamache as

"Market Support Specialist," among others. A true and accurate copy of the termination notice is attached as *Exhibit 2* and incorporated by reference.

83. The "chain of command" that the termination notice accused Ms. Grimes of "[b]reaking . . . by going to Bill Sparks" consisted of her July 1, July 4, July 17, and July 18, 2025 complaints to Mr. Sparks regarding the Cashier's sex-based slur and threat, suspected sexual harassment by Ms. Masterson, and the absence of sexual harassment training.

84. Mr. Pippens's termination notice, issued the same day, stated the same explanation word for word, including that he had broken "the chain of command by going to Bill Sparks."

85. Before terminating her, Defendant had not informed Ms. Grimes that she had caused any employee to quit or caused any loss of sales, and, upon information and belief, Defendant cannot identify any employee who left its employ because of Ms. Grimes. The stated reasons for Ms. Grimes's termination are false and are a pretext for discrimination and retaliation.

**G. Defendant's Shifting and Race-Conscious Explanations**

86. In its August 14, 2026 position statement to the EEOC, Defendant offered explanations for Ms. Grimes's termination that do not appear in the termination notice, including an alleged lack of candor, alleged poor work performance, an alleged May 2025 incident of drinking on the job that, by Defendant's own account, it had already addressed with a verbal warning before any of the events described above, and an alleged belief that Ms. Grimes was "conspiring with Pippens to manufacture a bogus sex harassment allegation against Masterson to get her fired."

87. Defendant further represented to the EEOC that Ms. Grimes's "knowingly false and inflammatory characterization of the Pippens' incident provided management, in part, with the basis" of that belief, and that her "repeated threats to circumvent the chain-of-command were unwarranted and unnecessarily hostile and confrontational."

88. Defendant also represented to the EEOC that Ms. Grimes's "persistence in seeking disciplinary action under false pretenses against two Caucasian employees, including a high level management employee, was concerning and had indicia of discriminatory conduct."

89. Defendant thus considered the race of the employees about whom Ms. Grimes complained—the Cashier and Ms. Masterson, both Caucasian—in evaluating her complaints and in deciding to terminate her, and treated a non-Caucasian manager's complaints about Caucasian employees as suspect because of the races of those involved.

90. Mr. Sparks, Jacob Gamache, Hilary Gamache, Ms. Masterson, and Cindy, each of whom received Ms. Grimes's complaints, participated in the decision to terminate her, or both, are Caucasian.

91. Defendant terminated Ms. Grimes, a mixed-race female Shift Manager who was the target of the Cashier's slur and challenge, and retained the Cashier, a Caucasian male subordinate who directed the slur and challenge at her, notwithstanding Mr. Sparks's written instruction that the Cashier be terminated for insubordination.

92. On the same day, Defendant terminated Mr. Pippens, the African-American employee who had supported Ms. Grimes's complaints, after having previously suspended him for one week for using profanity toward Ms. Masterson.

93. Upon information and belief, Defendant did not discipline Caucasian managers at the Restaurant who drank alcohol during their scheduled shifts. For example, Ms. Masterson observed a Caucasian manager named Taylor drinking alcohol with other employees and managers outside the Restaurant during a break in their scheduled shifts, and, upon information and belief, Defendant did not discipline Taylor. On another occasion, Taylor became ill in the Restaurant's office from drinking too much. Restaurant managers laughed about the incident when it was discussed, and, upon information and belief, Defendant did not discipline Taylor for it.

### H. Damages and Defendant's State of Mind

94. As a direct result of Defendant's conduct, Ms. Grimes has lost wages and the value of employment benefits, and she will continue to suffer such losses in the future.

95. As a direct result of Defendant's conduct, Ms. Grimes has suffered emotional distress, humiliation, embarrassment, anxiety, inconvenience, damage to her professional reputation, and loss of enjoyment of life.

96. Upon information and belief, Defendant maintains written policies prohibiting discrimination, harassment, and retaliation against employees who report discrimination or harassment, and trains its employees and supervisors on those policies. Upon information and belief, Defendant's managers, including Mr. Sparks, Jacob Gamache, Hilary Gamache, and Ms. Masterson, knew that federal law prohibits discrimination on the basis of race, color, and sex and prohibits retaliation against employees who oppose practices made unlawful by Title VII.

97. Defendant, acting through managerial agents within the scope of their employment, engaged in the conduct described above with malice or with reckless indifference to Ms. Grimes's federally protected rights.

### I. Ms. Grimes's Request for a Service Letter

98. Defendant is a business entity that does business in Missouri and that employed seven or more employees at all relevant times.

99. Ms. Grimes was employed by Defendant for more than ninety days before Defendant discharged her on July 22, 2025.

100. On July 8, 2026, within one year after her discharge, Ms. Grimes signed and sent by certified mail a written request addressed to "LFRC St. Louis LLC, c/o C T Corporation System, Registered Agent, 5661 Telegraph Road, Suite 4B, St. Louis, MO 63129-4275." The request made specific reference to section 290.140, RSMo, and asked that Defendant provide, within forty-five days of receipt, a signed letter setting forth the nature and character of the service she rendered, the duration of that service, and the true cause, if any, for which she was discharged. A true and

accurate copy of the request and the certified mail receipt is attached as *Exhibit 3* and incorporated by reference.

101. Upon information and belief, C T Corporation System was, at all relevant times, Defendant's registered agent in Missouri. United States Postal Service tracking records reflect that Ms. Grimes's request was delivered to C T Corporation System's address in St. Louis, Missouri, at 12:22 p.m. on July 13, 2026.

102. At the time Defendant received the request, Defendant was represented by counsel in the EEOC proceedings on the Charge and was aware of Ms. Grimes's discharge and her contention that the reasons given for it were false.

103. Defendant's forty-five-day period to issue the requested letter expired on August 27, 2026. Defendant has not issued any letter to Ms. Grimes in response.

**COUNT I**
**Race and Color Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)**

104. Plaintiff incorporates by reference the allegations of the Parties, Jurisdiction and Venue, Administrative Prerequisites, and Factual Allegations sections of this Complaint as if fully set forth herein.

105. Ms. Grimes is a member of protected classes on the basis of her race and color.

106. Ms. Grimes was qualified for, and satisfactorily performed, her position as Shift Manager.

107. Defendant discharged Ms. Grimes on July 22, 2025.

108. Ms. Grimes's race and color were motivating factors in Defendant's decision to discharge her, in violation of 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m). In the alternative, Defendant would not have discharged Ms. Grimes but for her race and color.

109. Defendant treated Ms. Grimes less favorably than similarly situated Caucasian employees, including the Cashier, who was retained after directing a sex-based slur and a challenge to fight at Ms. Grimes in the same incident for which Defendant later faulted her; Defendant

evaluated Ms. Grimes's complaints by reference to the race of the employees about whom she complained; and Defendant's stated reasons for her discharge are false, shifting, and pretextual.

110. As a direct result of Defendant's unlawful discrimination, Ms. Grimes has suffered and will continue to suffer the damages described above.

111. Defendant engaged in this discriminatory practice with malice or with reckless indifference to Ms. Grimes's federally protected rights, entitling her to punitive damages under 42 U.S.C. § 1981a(b)(1).

WHEREFORE, Plaintiff Loretta Grimes respectfully requests that the Court enter judgment in her favor and against Defendant LFRC St. Louis, LLC on Count I; award her back pay and lost benefits with prejudgment interest, and front pay in lieu of reinstatement; award her compensatory and punitive damages under 42 U.S.C. § 1981a in amounts to be determined by the jury; award her reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 2000e-5(k); award post-judgment interest as provided by law; and grant such other and further relief as the Court deems just and proper.

## COUNT II
## Sex Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)

112. Plaintiff incorporates by reference the allegations of the Parties, Jurisdiction and Venue, Administrative Prerequisites, and Factual Allegations sections of this Complaint as if fully set forth herein.

113. Ms. Grimes is a woman and is a member of a protected class on the basis of her sex.

114. Ms. Grimes was qualified for, and satisfactorily performed, her position as Shift Manager.

115. Defendant discharged Ms. Grimes on July 22, 2025.

116. Ms. Grimes's sex was a motivating factor in Defendant's decision to discharge her, in violation of 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m). In the alternative, Defendant would not have discharged Ms. Grimes but for her sex.

117. Defendant discharged Ms. Grimes, the female supervisor who was called a sex-specific slur and challenged to fight, while retaining the male subordinate who directed that slur and challenge at her, notwithstanding its corporate office's written instruction that he be terminated; and Defendant's stated reasons for her discharge are false, shifting, and pretextual.

118. As a direct result of Defendant's unlawful discrimination, Ms. Grimes has suffered and will continue to suffer the damages described above.

119. Defendant engaged in this discriminatory practice with malice or with reckless indifference to Ms. Grimes's federally protected rights, entitling her to punitive damages under 42 U.S.C. § 1981a(b)(1).

WHEREFORE, Plaintiff Loretta Grimes respectfully requests that the Court enter judgment in her favor and against Defendant LFRC St. Louis, LLC on Count II; award her back pay and lost benefits with prejudgment interest, and front pay in lieu of reinstatement; award her compensatory and punitive damages under 42 U.S.C. § 1981a in amounts to be determined by the jury; award her reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 2000e-5(k); award post-judgment interest as provided by law; and grant such other and further relief as the Court deems just and proper.

## COUNT III
## Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a)

120. Plaintiff incorporates by reference the allegations of the Parties, Jurisdiction and Venue, Administrative Prerequisites, and Factual Allegations sections of this Complaint as if fully set forth herein.

121. Ms. Grimes engaged in activity protected by 42 U.S.C. § 2000e-3(a) by opposing practices she reasonably and in good faith believed to be unlawful under Title VII, including by (a) reporting to her managers on June 22, 2025, that the Cashier had called her a sex-specific slur and challenged her to fight, and stating that she would complain to Defendant's corporate office if he was not disciplined; (b) asking her manager that all employees and managers receive sexual

harassment training; (c) complaining to Mr. Sparks on July 1, 2025, that her report of the Cashier's conduct had not been addressed; (d) reporting to Mr. Sparks and Defendant's upper management on July 4, 2025, conduct by Ms. Masterson that she reasonably believed could constitute sexual harassment, and renewing her request for sexual harassment training; (e) following up on those complaints and requests on July 17, 2025; and (f) defending the good faith of her complaints on July 18, 2025.

122. Defendant, through Mr. Sparks, Jacob Gamache, Hilary Gamache, Ms. Masterson, and Mr. Brown, had actual knowledge of Ms. Grimes's protected activity.

123. Defendant discharged Ms. Grimes on July 22, 2025, eighteen days after her July 4 report of suspected sexual harassment and four days after her July 18 email defending her complaints. Discharge is an action that would dissuade a reasonable employee from making or supporting a charge of discrimination.

124. Defendant would not have discharged Ms. Grimes but for her protected activity. Among other things, (a) Defendant's termination notice expressly cited her "going to Bill Sparks" as a reason for her discharge; (b) Mr. Sparks, after receiving her July 4 report, accused her of "causing trouble by fabricating stories," criticized her for "going over [her managers'] head and coming to me," and told her "it's OK to leave"; (c) Mr. Sparks had directed the Cashier's termination on July 1, 2025, with Ms. Grimes's own account of the incident in hand, and reversed course to fault Ms. Grimes only after her July 4 report concerning Ms. Masterson; (d) Ms. Masterson, the subject of that report, signed Ms. Grimes's termination notice; (e) Defendant discharged Mr. Pippens, who had written to Mr. Sparks in support of Ms. Grimes, on the same day and for the same stated reasons; (f) Defendant has represented to the EEOC that its belief that Ms. Grimes's harassment report was false formed part of the basis for her discharge; and (g) Defendant's stated reasons for her discharge are false, shifting, and pretextual.

125. As a direct result of Defendant's unlawful retaliation, Ms. Grimes has suffered and will continue to suffer the damages described above.

126. Defendant engaged in this retaliation with malice or with reckless indifference to Ms. Grimes's federally protected rights, entitling her to punitive damages under 42 U.S.C. § 1981a(b)(1).

WHEREFORE, Plaintiff Loretta Grimes respectfully requests that the Court enter judgment in her favor and against Defendant LFRC St. Louis, LLC on Count III; award her back pay and lost benefits with prejudgment interest, and front pay in lieu of reinstatement; award her compensatory and punitive damages under 42 U.S.C. § 1981a in amounts to be determined by the jury; award her reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 2000e-5(k); award post-judgment interest as provided by law; and grant such other and further relief as the Court deems just and proper.

## COUNT IV
## Race Discrimination in Violation of 42 U.S.C. § 1981

127. Plaintiff incorporates by reference the allegations of the Parties, Jurisdiction and Venue, Administrative Prerequisites, and Factual Allegations sections of this Complaint as if fully set forth herein.

128. Section 1981 guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens, including the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(a)–(b).

129. Ms. Grimes, who is of mixed race, partially of African-American descent, and is not Caucasian, is a member of a class protected by Section 1981.

130. Ms. Grimes had a contractual employment relationship with Defendant within the meaning of Section 1981, including an at-will employment relationship under which she performed services for Defendant in exchange for wages.

131. Defendant intentionally discriminated against Ms. Grimes on the basis of her race by terminating her employment on July 22, 2025, thereby interfering with her right to make and

enforce contracts and to enjoy the benefits, privileges, terms, and conditions of her employment on the same basis as white citizens.

132. But for Ms. Grimes's race, Defendant would not have terminated her employment. Among other things, Defendant retained the Caucasian Cashier who directed a slur and a challenge to fight at her; Defendant treated her complaints about two Caucasian employees as bearing "indicia of discriminatory conduct" because of the races of the employees involved; Defendant disciplined non-Caucasian employees more harshly than Caucasian employees for comparable or less serious conduct; and Defendant's stated reasons for her discharge are false, shifting, and pretextual.

133. As a direct result of Defendant's unlawful discrimination, Ms. Grimes has suffered and will continue to suffer the damages described above.

134. Defendant acted with malice or with reckless indifference to Ms. Grimes's federally protected rights, entitling her to punitive damages.

WHEREFORE, Plaintiff Loretta Grimes respectfully requests that the Court enter judgment in her favor and against Defendant LFRC St. Louis, LLC on Count IV; award her back pay and lost benefits with prejudgment interest, and front pay in lieu of reinstatement; award her compensatory and punitive damages in amounts to be determined by the jury; award her reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988(b)–(c); award post-judgment interest as provided by law; and grant such other and further relief as the Court deems just and proper.

## COUNT V
## Failure to Issue Service Letter in Violation of Section 290.140, RSMo

135. Plaintiff incorporates by reference the allegations of the Parties, Jurisdiction and Venue, and Factual Allegations sections of this Complaint as if fully set forth herein.

136. Section 290.140.1, RSMo, requires an employer subject to the statute, upon the timely written request of a discharged employee who has worked for it for at least ninety days, made by certified mail with specific reference to the statute, to issue within forty-five days after

receipt of the request a letter, duly signed by its superintendent or manager, setting forth the nature and character of the service rendered by the employee, the duration of that service, and truly stating the cause, if any, for which the employee was discharged.

137. Defendant is subject to section 290.140, RSMo.

138. Ms. Grimes satisfied each requirement of section 290.140.1, RSMo: she was employed by Defendant for more than ninety days; Defendant discharged her; and, within one year after her discharge, she made a written request by certified mail to Defendant's registered agent that she signed and that made specific reference to the statute.

139. Defendant failed to issue any letter to Ms. Grimes within forty-five days after its receipt of her request, and has not issued one to date.

140. Under section 290.140.2, RSMo, an employer that does not issue a requested service letter may be liable for nominal and punitive damages.

141. Defendant's failure to issue the requested letter was knowing and intentional and without just cause or excuse. Upon information and belief, Defendant received the request while represented by counsel in proceedings concerning Ms. Grimes's discharge and deliberately chose not to respond.

WHEREFORE, Plaintiff Loretta Grimes respectfully requests that the Court enter judgment in her favor and against Defendant LFRC St. Louis, LLC on Count V; award her nominal damages and punitive damages pursuant to section 290.140.2, RSMo, in amounts to be determined by the jury; award her costs; and grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and 42 U.S.C. § 1981a(c), Plaintiff demands a trial by jury on all issues so triable.

Dated: November 25, 2026

Respectfully submitted,

**DONNER APPLEWHITE, ATTORNEYS AT LAW**

/s/ Christopher J. Herman
Christopher J. Herman, #75841
5205 Hampton Avenue
Saint Louis, Missouri 63109
Telephone: (314) 293-3525
Facsimile: (888) 785-4461
chris.herman@da-lawfirm.com

*Attorney for Plaintiff Loretta Grimes*

**<u>Exhibits to Complaint</u>**

| | |
|---|---|
| Exhibit 1 | EEOC Determination and Notice of Rights, Charge No. 560-2026-01383 (issued Sept. 1, 2026) |
| Exhibit 2 | Termination Notice, “PSF Employee termination, STORE 205770” (July 22, 2025) |
| Exhibit 3 | Service Letter Request (July 8, 2026), with USPS Certified Mail Receipt and USPS Tracking Confirmation of Delivery (July 13, 2026) |